UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

ZOE SAMANTHA WATSON,

        Plaintiff,

v.                                                    Civil Action No. 2:15cv407

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

        Defendant.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Zoe Samantha Watson ("Watson") seeks judicial review of the decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act.  Specifically, Watson claims that the Administrative Law Judge ("ALJ")'s residual functional capacity ("RFC") failed to account for the effects of her mental impairments, and the ALJ relied on testimony from the vocational expert ("VE") that did not fairly account for her impairments.  This action was referred to the undersigned United States Magistrate Judge pursuant to provisions of 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure.  For the reasons stated below, this report recommends that the court affirm the final decision of the Commissioner.

## I.      PROCEDURAL BACKGROUND

On February 26, 2014, Watson filed an application for DIB, alleging that she was disabled as of September 1, 2013, primarily as a result of spinal pain, migraines, fibromyalgia, severe depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder.  (R. 143-44, 191).  The Commissioner denied her application initially, (R. 85), and upon reconsideration, (R.

1

99). Watson then requested an administrative hearing, (R. 121), which was conducted on September 30, 2014, (R. 33).

On November 25, 2014, the ALJ concluded that Watson was not disabled within the meaning of the Social Security Act and denied her claim for DIB. (R. 33-47). The Appeals Council denied Watson's request for review of the ALJ's decision, (R. 1), thereby making the ALJ's decision the final decision of the Commissioner. Pursuant to 42 U.S.C. § 405(g), Watson filed this action seeking judicial review of the Commissioner's decision. This case is now before the court on the parties' cross-motions for summary judgment.

## II.   FACTUAL BACKGROUND

Watson was born in 1973, and was thirty-nine years old on her alleged disability onset date. (R. 45). She completed four years of college, obtaining a Bachelor of Science degree, and later received a Master's Degree in professional counseling. (R. 58, 192). Watson was previously employed from 1992 to 2013 as an information manager in the United States Air Force, and while in the Air Force, she attended the Non-Commissioned Officer Academy, receiving an A+ certification. (R. 61, 193). She has not worked since August 31, 2013, when she retired from active duty with the United States Air Force. (R. 192).

In July 2012, Watson had several MRIs to evaluate her low back pain.[1] (R. 282-87). The MRIs showed that at L4-5, she had "degenerative disc disease with mild broad-based disc bulge impressing upon the anterior thecal sac," and at L5-S1, she had "degenerative disc disease with disc space narrowing and generalized disc bulge causing flattening of anterior thecal sac." (R. 285). In January 2013, Watson presented to the Pain Management clinic at the Naval Medical Center in Portsmouth, Virginia, complaining of low back pain. (R. 435). She received an epidural steroid

---

[1] Although the treatment that Watson received starting in July 2012 is before her alleged disability onset date – September 1, 2013 – this report briefly discusses this treatment because later treatment was based on symptoms that were examined and diagnosed during this period.

injection for the pain, and the treatment notes state that "[s]he has received good benefit from intermittent ILESI [interlaminar epidural steroid injection]." Id. In March 2013, Dr. Angelique Collamer, a rheumatologist, noted that Watson "meets ACR [American College of Rheumatology] criteria for fibromyalgia," and recommended a "multidisciplinary approach to treatment" of her fibromyalgia, including "cognitive behavioral therapy, low impact aerobic exercise conditioning program, and correction of her sleep disturbance." (R. 408).

In July 2013, Watson presented to the Langley Mental Health Clinic for a mental health appointment. (R. 327). Dr. Robert Marietta reported that Watson had "a history of depression," but Watson was "satisfied with her current meds." Id. He noted that she was currently taking Cymbalta (medication used to treat depression, neuropathic pain, and fibromyalgia), Ambien (insomnia medication), and Wellbutrin (antidepressant medication). Id. Dr. Marietta described Watson's mood at the appointment as follows: "Mood pleasant. Affect congruent.... Thought process logical.... Memory and cognition grossly intact. Insight and judgment intact." (R. 328). On August 8, 2013, Watson had a mental health consultation at the Hampton Veterans Affairs Medical Center. (R. 253-58). Staff Psychologist Kathy Babel diagnosed Watson with "Major Depressive Disorder (by history)" and post-traumatic stress disorder, and noted that as a child, Watson had suffered both sexual abuse and emotional neglect. (R. 257).

On September 11, 2013, Watson had an MRI of her lumbar spine, and Dr. Benie Skinner reported that she had "degenerative disc disease L4-5 and L5-S1" and "mild nonspecific left-sided paraspinal muscle edema ... at the L3, L4, and L5 vertebral levels." (R. 817). Specifically, at L4-5, the MRI showed "mild degenerative disc space narrowing," "no evidence of significant canal encroachment," and "mild right-sided exit foraminal encroachment." Id. At L5-S1, the MRI reflected "degenerative disc space narrowing ... with a shallow broad-based disc protrusion." Id. On September 12, 2013, Watson submitted a claim to the Department of Veterans Affairs ("VA")

3

for a service-connected compensation, and the VA approved her claim based on a 90 percent disability rating. (R. 270-73).

In April 2014, Watson presented to Dr. Ali H. Baalbaki, a pain management specialist, complaining of low back pain. (R. 819-22). Watson reported that she was "[a]ble to perform activities of daily living including eating, bathing, toileting, dressing and getting up from bed or chair." (R. 819). Dr. Baalbaki's examination revealed "no pain with lateral rotation, forward flexion or extension of the neck," "no clubbing, cyanosis or edema of the upper extremities," and "no ankle edema ... no muscle atrophy, ... normal muscle tones, [and] muscle strength was intact 5/5 over major muscle groups" of the lower extremities." (R. 821). Dr. Baalbaki recommended that Watson start Zanaflex and Tizanidine, prescription muscle relaxers, to treat her muscle pain and spasms. (R. 819).

On April 29, 2014, Watson presented to George L. Fenigsohn, Ed.D., a licensed professional counselor. (R. 788). Watson "described great anxiety over her terminally ill 11-year-old child who is on life-support in her home and is both blind and deaf," and stated that "[t]his contributed to [her] inability to concentrate, anger, short temper, and difficulty driving." Id. She also reported that she had short-term memory loss and that "performing detailed and complex tasks [was] beyond her ability and that she often feels overwhelmed." (R. 789-90). Based on Watson's reported symptoms, Dr. Fenigsohn diagnosed her with major depressive disorder and post-traumatic stress disorder, and noted that she had suffered from sexual abuse and emotional neglect as a child. (R. 789). Dr. Fenigsohn also reported that "it appears that performing work activities on a consistent basis, interacting with coworkers and the public and dealing with the usual stressors in competitive work would be, at this time, due to her physical and mental condition highly problematic." (R. 790).

On May 8, 2014, Watson had a lumbar medial branch block, an injection to treat her low back pain and lumbar spondylosis. (R. 815). Watson presented to Dr. James P. Campbell at the Portsmouth Naval Medical Center's Neurosurgery department on June 18, 2014, complaining of low back pain. (R. 861-63). Dr. Campbell noted that "she ha[d] not undergone any physical therapy as of recently," that "she currently [was] not taking a significant amount of pain medication," and that "she started taking Ibuprofen yesterday." (R. 861). Upon examination, Dr. Campbell reported that Watson had "5/5 strength in the upper and lower extremities throughout" and "2/4 reflexes throughout." (R. 862). Dr. Campbell stated that he "had a long discussion with [Watson] regarding therapeutic dosing of Ibuprofen, and that the 200 mg she [wa]s taking 2 to 3 times a week [wa]s not sufficient enough to help with her low back pain." (R. 863). He recommended that Watson "start taking 600 to 800 mg of Ibuprofen 3 times a day for a week to see if this helps alleviate some of her low back pain" and "continue to see pain management for injections for her low back pain." (R. 863).

Starting in April 2014 and continuing through July 2014, Watson had several appointments with Chiropractor Joseph Marcil, D.C. (R. 793-812). She described her low back pain as between a 7 and 8 on a scale of 10. (R. 800). In July 2014, Watson received a "[f]luoroscopically guided [s]acroiliac joint injection" for her "lower back and gluteal pain" and "bilateral sacro-iliac dysfunction." (R. 814). Prior to the injection, the doctor reported that "[t]he paraspinal and paravertebral muscles were examined and were tender." Id.

In July 2014, Watson started mental health treatment at Hampton Mental Health Associates, Inc. (R. 933). At her first appointment on July 8, 2014, the social worker recommended that Watson continue therapy with the goal to "explore underlying issues related to symptoms" and "develop coping skills." (R. 934). Watson had a follow-up mental health appointment on July 23, 2014. (R. 936-37). Social Worker Marie Gingras reported that Watson was "guarded/defensive

during session," was "highly critical of herself," and "suffers from low self esteem." (R. 936). Ms. Gingras's notes reflect Watson's prior diagnoses of major depression, generalized anxiety disorder, and post-traumatic stress disorder. Id. At an August 6, 2014 appointment, Ms. Gringras reported that Watson was "in a depressed mood and irritated/angry." (R. 938). Watson stated that "her 'anxiety was through the roof and [she was] … drinking alot [sic] of wine.' " Id. On August 27, 2014, at another appointment with Ms. Gringras, Watson reported that "she was prescribed Ritalin by Dr. [Linda] Sabonya," a doctor with Hampton Mental Health Associates, Inc.," and she reported that "she [was] completing more tasks, [and had] increased motivation." (R. 940, 946). Ms. Gringras noted that Watson "presented with a more positive mood than previous session." (R. 940).

On September 25, 2014, Dr. Sabonya completed a medical evaluation report on September 25, 2014, stating that Watson was "markedly limited" in her ability to: "understand and remember detailed instructions," "carry out detailed instructions," "maintain attention and concentration for extended periods," "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance," and "travel in unfamiliar places or use public transportation." (R. 949-51). Dr. Sabonya also reported that Watson was "moderately limited" in her ability to: "remember locations and work-like procedures," "sustain an ordinary routine without special supervision," "work in coordination or proximity to others without being distracted by them," "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," "accept instructions or respond appropriately to criticism from supervisors," "respond appropriately to customary stresses in a work setting," "be aware of normal hazards and take appropriate precautions," and "set realistic goals or make plans independently of others." Id.

At the initial level of administrative review, state agency psychologist Dr. Jo McClain, Psy.D, reviewed the evidence of record. Dr. McClain reported that Watson suffered from an

affective disorder and anxiety-related disorder, both of which were medically determinable impairments that did "not precisely satisfy the diagnostic criteria." (R. 93). Dr. McClain also noted that these conditions caused mild "restriction of activities of daily life," moderate "difficult[y] in maintaining social functioning," and moderate "difficult[y] in maintaining concentration, persistence or pace." Id. In assessing Watson's mental residual functional capacity, Dr. McClain stated that as to any limitations with sustained concentration and persistence, Watson "reports fatigue, chronic pain, and depression which may interfere with her ability to concentrate and attend regularly; however, she would be capable of performing simple and skilled tasks." (R. 97). As to her social interaction limitations, Dr. McClain noted that Watson "goes out to shop, to the movies and to church on a regular basis, though she has come to withdraw from others due to depressed and irritable mood states. Would do best in work with modest social demands." Id. Dr. McClain concluded that Watson "remains capable of understanding and remembering instructions, concentrating, persisting at work duties to completion, interacting appropriately with people, and adapting to changing activities within the workplace." (R. 98). As to Watson's physical residual functional capacity, state agency physician Dr. Carolina Bacani-Longa, M.D., also reviewed the evidence of record and concluded that Watson retained the capacity to work at the light level of exertion, could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, sift for approximately six hours of an eight-hour workday, and was limited in her ability to push and/or pull. (R. 95, 99).

On September 30, 2014, at the hearing before the ALJ, Watson testified about her past work history. Watson stated that she last worked as an information manager with the United States Air Force at the E-6 rank, and that in this position she "took care of people's classifications ... took care of equipment accountability; ... fixed computers; ... moved computers; ... did inventory; [and] helped out with whatever administrative need that was needed for the commander." (R. 59, 61).

She testified that she had served with the United States Air Force for "twenty years and nine months" before her retirement on August 31, 2013. (R. 59). After retiring, Watson stated that she volunteered for Virginia Board of Family Disabilities, and "attempted to start a photography business but ... realized how taxing it was on [her] body to carry the camera around and take pictures all day long." (R. 60-61). Watson also described her normal daily routine, stating that she "usually can't sleep because of insomnia issues," and she "usually gets up, tr[ies] to make [her]self something to eat, ... check[s] on her daughter ... [and] a lot of times [she] might just go back to bed, depending on how [she] feels and depending on the weather." (R. 58). With regard to caring for her terminally ill eleven-year old daughter, Watson testified that "when the nurse doesn't show [she has to] be the one to take care of her [daughter], change her diaper and change her vent and change her feedings." (R. 62). When the ALJ asked Watson why she could no longer work fulltime, she stated, "Mostly because of being around people and having to deal ... I get really short when it comes to people, and then I'm usually so tired and I have a lot of pain." (R. 61).

In addition to Watson's testimony, the ALJ heard testimony from vocational expert Edith Edwards. Ms. Edwards testified that Watson's work as an information manager with the United States Air Force was a medium, skilled position. (R. 70). She testified that a hypothetical person with the same age, education, and work history as Watson who could complete simple, routine tasks that required training of up to one month, occasionally use ladders, ropes, and scaffolds, occasionally engage in bilateral pushing, pulling, and overhead work, occasionally be exposed to unprotected heights and hazards, and occasionally interact with the public, co-workers could perform light, unskilled work as a cleaner or housekeeper (375,000 jobs nationally), and a clerical checker (130,000 jobs nationally). (R. 70-71). At the sedentary, unskilled level, Ms. Edwards testified that a hypothetical person with the previously listed limitations could work as a

8

surveillance system monitor (125,000 jobs nationally) and as a sorter (110,000 jobs nationally). (R. 71).

### III.   STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### IV.   ANALYSIS

To qualify for disability insurance benefits under sections 416(i) and 423 of the Social Security Act, an individual must meet the insured status requirements of these sections, be under

9

age sixty-five, file an application for disability insurance benefits, and be under a "disability" as defined in the Act. 42 U.S.C. §§ 416(i), 423. The Social Security Regulations define "disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); <u>see also</u> 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A). To meet this definition, a claimant must have a "severe impairment" that makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); <u>see</u> 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do the work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from doing any other work?

20 C.F.R. § 1520(a)(4).

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes

10

disability.  See id. §§ 404.1520, 416.920.  The burden of proof and production rests on the claimant

during the first four steps, but shifts to the Commissioner on the fifth step.  Pass v. Chater, 65 F.3d

1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).  When

conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the

diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective

evidence of pain and disability; and (4) the claimant's educational background, work history, and

present age.  Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff,

298 F.2d 850, 851 (4th Cir. 1962)).  At all steps the ALJ bears the ultimate responsibility for

weighing the evidence.  Hays, 907 F.2d at 1456.

A.     The ALJ's Decision

After conducting this five-step analysis, the ALJ concluded that Watson met the insured

status requirements, but had not been under a disability within the meaning of the Social Security

Act between her alleged disability onset date, September 1, 2013, and the ALJ's decision,

November 25, 2014.[2]  (R. 33-47).

At step one, the ALJ found that Watson had not engaged in substantial gainful activity since

her alleged disability onset date, September 1, 2013.  (R. 35).  At step two, the ALJ found that

Watson suffered from the following severe impairments: depression, anxiety, post-traumatic stress

disorder, migraine headaches, fibromyalgia, cervical and lumbar degenerative disc disease, and

degenerative joint disease of the ankle.  Id.  At step three, the ALJ found that Watson did not suffer

from an impairment or combination of impairments that met the severity of one of the listed

impairments, (R. 36), and at step four, the ALJ found that Watson's impairments prevented her

---

[2] Several times in the ALJ's written decision, he misnames the Plaintiff as "Ms. Rodriguez," rather than Ms.
Watson.  However, the facts discussed in the decision are specific to Ms. Watson's medical records and
personal history.  Neither party presents any argument related to this misnomer, and therefore this report
does not discuss this issue any further.

from performing her past relevant work, (R. 45).   In drawing his step four conclusion and fashioning Watson's RFC, the ALJ determined that Watson was able to perform light work and simple repetitive tasks that require up to one month of training with the following limitations: occasionally climb ladders, scaffolds, and ropes; perform tasks requiring no more than occasional bilateral pushing, pulling, and overhead work; occasional exposure to unprotected heights and hazards, such as dangerous, moving machinery; occasional interaction with the public, co-workers, and supervisors. (R. 39).  At step five, the ALJ concluded that jobs which Watson could perform exist in significant numbers in the national economy. (R. 46).

In making his RFC determination and finding of no disability, the ALJ found that "[t]he evidence establishes the existence of medically determinable impairments that can reasonably be expected to result in the types of symptoms the claimant reports but the record does not support the degree of limitations she alleges." (R. 39).  Specifically, the ALJ gave slight weight "to the opinions of the DDS medical consultants at the initial level of denial because they are superseded by subsequent more recent medical evidence and by the opinions of the medical consultants at the reconsideration level." (R. 43).  The ALJ gave significant and greater weight to the opinions of the DDS medical consultants at the reconsideration level of denial, "which included 'moderate' limitations in social functioning and concentration and the ability to perform work activities in the 'light' exertion range." (R. 44).  The ALJ gave partial weight to the opinions of Watson's examining licensed professional counselor, Dr. Fenigsohn, noting that "[t]he undersigned agrees that the claimant has moderate limitations but not with Dr. Fenigsohn's conclusion that the claimant is unable to work because" Dr. Fenigsohn factored in physical limitations beyond his expertise. Id. The ALJ gave partial weight to the opinions of Dr. Sabonya, Watson's treating psychiatrist, noting that some of the "findings are not supported by the treatment records." Id. The ALJ gave "great weight to the findings of Dr. Campbell, who reported that the claimant's degenerative disc disease

12

had not progressed." Id. With regard to Watson's VA disability rating, the ALJ gave partial weight to the 90 percent disability rating, explaining that the objective medical evidence did not support a finding of disability within the meaning of the Social Security Act. Id.

**B.      The ALJ Properly Accounted for Watson's Mental Impairments When Making His RFC Determination.**

Watson's only substantive argument is that the ALJ's RFC failed to account for her mental limitations in social functioning, concentration, persistence, and pace of activity in the work setting. Pl.'s Br. (ECF No. 9, at 21-25). Because this RFC finding informed the ALJ's questions to the VE, Watson also contends that the VE's testimony was not substantial evidence to support his finding that she was not disabled. After reviewing, the medical evidence, and the ALJ's six-and-a-half page functional analysis, the undersigned finds that the RFC is supported by substantial evidence and the VE's testimony properly considered it as an accurate statement of Watson's functional limitations.

An RFC is the plaintiff's maximum ability to work despite her impairments. 20 C.F.R. § 404.1545(a)(1); see Social Security Ruling 96-9p, 1996 WL 374185 (S.S.A.) ("RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis."). When, as is the case here, a plaintiff's impairments do not meet or equal a listed impairment under step three of the sequential analysis, the ALJ must determine the plaintiff's RFC. 20 C.F.R. 404.1520(e). At step four, the ALJ then determines whether the plaintiff can perform her past relevant work. Id. § 404.1545(a)(5)(i). If the ALJ determines that the plaintiff cannot perform any relevant past work, as was the case for Watson, the ALJ uses the RFC at step five to determine if the plaintiff can "adjust to any other work that exists in the national economy." Id. § 404.1545(a)(5)(ii).

The ALJ is responsible for determining a plaintiff's RFC at the administrative hearing level, and in making this determination, the ALJ considers all of the relevant medical and other evidence[3] in the record. Id. §§ 404.1527(b), 404.1545(a)(3), 404.1546(c). "[R]elevant evidence ... include[es] information about the individual's symptoms and any 'medical source statements' – i.e., opinions about what the individual can still do despite his or her impairment(s) – submitted by an individual's treating source or other acceptable medical sources." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A.).

Here, the ALJ determined that Watson would be able to perform light work in a stable work environment while performing simple, routine, repetitive tasks, requiring training of no more than one month. (R. 39). The RFC also limited Watson to only occasional interaction with the public, co-workers, or supervisors.[4] Id. Watson contends that the ALJ's RFC did not adequately account for her mental impairments, arguing that because the ALJ determined at step three that she had "moderate limitations in social functioning and moderate limitations in concentration, persistence, and pace," he should have included additional limitations in her RFC. (ECF No. 9, at 21-22). That is, Watson argues that contrary to the Fourth Circuit's holding in Mascio v. Colvin, the ALJ's RFC "included only the nonexertional limitation that Watson can perform no more than simple, routine, repetitive tasks with only occasional interaction with the public, co-workers and supervisors." Id. at 22 (citing Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015)). She also argues that "post-Mascio, ... a reviewing court has to understand the rationale behind a finding of moderate limitation in order to assess the validity of the presence or absence of corresponding limitations in an RFC," and because

---

[3] "Other evidence" includes "statements or reports from [the claimant], [the claimant's] treating or nontreating source, and others about [the claimant's] medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how ... how impairment(s) and any related symptoms affect [the claimant's] ability to work. 20 C.F.R. § 404.1529(a).

[4] The RFC also accommodated Watson's physical limitations due to her back pain, but she has not identified any error in the ALJ's assessment or accommodation of these conditions.

the ALJ failed to explain his finding of moderate limitation, the court cannot "understand the rationale behind the finding." Pl.'s Reply Br. (ECF No. 12, at 4) (quoting Handy v. Comm'r, Soc. Sec. Admin., No. SAG-09-166, 2015 WL 9302972, at *3 n.4 (D. Md. Dec. 21, 2015)).

In Mascio, the Fourth Circuit held that the ALJ's "residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis,' " and "only after that may [residual functional capacity] be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." Mascio, 780 F.3d at 636 (quoting Social Security Ruling 96-8p, 61 Fed. Reg. 34,474, 34,475 (July 2, 1996)). Additionally, the Fourth Circuit noted that "the residual functional capacity 'assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts ... and nonmedical evidence.' " Id. (quoting Social Security Ruling 96-8p). When the ALJ does not perform an explicit function-by-function analysis, "remand may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)).

With regard to mental impairments, the Fourth Circuit in Mascio stated that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.' " Id. at 638 (citing Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011)). If the ALJ concludes that "the concentration, persistence, or pace limitation does not affect [the claimant's] ability to work," the ALJ is required to "explain why ... [a finding of] moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in [the] residual functional capacity." Id.

Only after providing this explanation would it be "appropriate to exclude [these limitations] from the hypothetical tendered to the vocational expert." Id.

In the present case, the ALJ extensively examined the evidence in the record, and performed a function-by-function analysis, discussing the evidence and the weight he gave to the evidence. In six-and-a-half detailed pages of analysis, the ALJ assessed Watson's statements, as well as the observations of her treating medical professionals, and determined the appropriate weight to be afforded to the opinions based on the support they received from Watson's medical records. With regard to her mental health treatment, the ALJ gave partial weight to the opinions of Dr. George Fenigsohn, Ed.D." (R. 44). The ALJ explained that Dr. Fenigsohn's conclusion that it would be "highly problematic" for Watson to perform activities on a consistent basis, interact with co-workers, and deal with the usual stress of competitive work was "not consistent with the assigned GAF[5] of 60 or the findings of Dr. Fenigsohn throughout the evaluation." (R. 42). The ALJ further stated that Dr. Fenigsohn's opinion was supported only by Watson's subjective complaints, and appeared to be based "at least partially on the claimant's reported physical problems without benefit of the medical records," and that such a determination based on physical impairments was "beyond [Dr. Fenigsohn's] expertise as a licensed professional counselor/Ed.D." Id. The ALJ also gave partial weight to the opinions of Dr. Sabonya because "the psychiatrist reported 'marked' limitations in the claimant's ability to maintain a schedule and attendance," but "these findings are not supported by the treatment records." (R. 44). The ALJ concluded by agreeing with Dr.

---

[5] Clinicians use the GAF scale, devised by the American Psychiatric Association and ranging from zero to one hundred, to indicate an overall judgment of a person's psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). A GAF of 71-80 indicates that "if symptoms are present, they are transient and expectable reactions to psycho-social stressors;" a GAF of 61-70 indicates that the individual has "some mild symptoms;" a GAF of 51-60 indicates that the individual has "moderate symptoms;" and a GAF of 41-50 indicates that the individual has "serious symptoms." Id. However, the DSM-5 abandoned the use of GAF scores as a diagnostic tool for assessing a patient's functioning because of the questionable probative value of such scores. Diagnostic and Statistical Manual of Mental Disorders (DSM-V) 16 (5th ed. 2013).

Fenigsohn that Watson "would not be significantly limited in her ability to carry out simple instructions" as demonstrated by her rigorous daily activity carrying for her disabled daughter, and by the information in her therapy records. Id. This evidence supports his conclusion at step four that she could maintain a fulltime work schedule, and that her limitations in concentration were properly accounted for in his hypothetical.

Watson's reference to "moderate limitations" in "concentration, persistence, and pace" is derived from the ALJ's separate analysis as to "limitations in the 'paragraph B' criteria," which "are used to rate the severity of mental impairments at step 2 and step 3 of the sequential evaluation process," but are not used to fashion the RFC at step four. (R. 38). Performing the severity analysis, the ALJ found that she had only mild restriction on her daily living activities. Id. And, with regard to social functioning and maintaining concentration, persistence, or pace, the ALJ found that she had moderate difficulties based on Watson's testimony, the objective medical evidence, and the opinion of her treating mental health professionals. (R. 37-38). But after performing the function-by-function analysis required at step four, the ALJ found that "[t]he evidence of moderate mental symptoms supports the restrictions in interacting with others in the workplace and carrying out more than simple tasks that are incorporated in the residual functional capacity [RFC]." (R. 45). That is, unlike the plaintiff in Mascio, Watson's RFC included specific restrictions to accommodate her mental impairments and limitations in concentration by limiting her work to "activities requiring only occasional interaction with the public, co-workers, and supervisors" and no more than one month of training. (R. 39). And the ALJ's detailed analysis of the evidence in the medical record confirms that his RFC finding considered all of the evidence – both physical and mental symptoms – and properly accounted for any mental impairments supported by the record. Accordingly, the undersigned finds that the ALJ's RFC was supported by substantial evidence.

C.     **The VE's Testimony in Response to Hypotheticals Properly Accounted for Watson's Mental Impairments.**

Watson next contends that the ALJ relied on testimony from the VE that did not properly account for all of her impairments. (ECF No. 9, at 25-26). That is, Watson claims that the "ALJ's hypothetical question posed to the vocational expert ... contained only those limitations he subsequently found to constitute Watson's residual functional capacity," and because the RFC was not proper, the testimony of the VE was also incomplete. Id. at 26.

At the administrative hearing, the ALJ poses hypothetical questions to the VE, and these hypotheticals must account for all of the claimant's limitations as shown by the record. Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989). If limitations are omitted, the VE's testimony is of limited value, and may not constitute substantial evidence. See Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005) (citing Walker, 889 F.2d at 50). Failing to consider limitations shown by the evidence, and then relying upon the errant hypothetical to form an opinion about the availability of work suitable to the claimant is error. Hancock v. Barnhart, 206 F. Supp. 2d 757, 767 (W.D. Va. 2002).

As stated above, the Fourth Circuit in Mascio held that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" Mascio, 780 F.3d at 638 (citing Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011)). If the ALJ concludes that moderate limitations in concentration, persistence, or pace do not affect the claimant's ability to work, the ALJ must provide an explanation as to why these moderate limitations do not translate into a limitation in the RFC. Id.

In this case, as detailed above, the ALJ included additional limitations in the RFC to account for Watson's mental impairments – limiting her to "work activities requiring only occasional

interaction with the public, co-workers and supervisors" – and he thoroughly explained why he fashioned the RFC to include these limitations. That is, as set forth in <u>Mascio</u>, the ALJ performed a function-by-function analysis to determine the RFC, and this analysis and his explanations support the hypotheticals he posed to the VE. Specifically, as anticipated by <u>Mascio</u>, the ALJ in this case explained why the moderate limitation in the broad paragraph B criteria of concentration, persistence and pace, translated into narrower limits in the function-by-function analysis required to arrive at his RFC. <u>Mascio</u>, 780 F.3d at 638. And, when examining the VE, the ALJ properly incorporated the mental status limitations that were supported by the medical evidence he relied upon.

In the ALJ's examination of the VE, he first asked the VE to characterize Watson's past work, which she characterized as medium, skilled work. (R. 70). After determining that Watson could not perform her past work at the medium, skilled level, and the ALJ crafted a hypothetical that mirrored the limitations set forth in the RFC, such as restricting Watson's work to "simple, routine tasks with training duration of up to a month[,] and occasional interaction with public, co-workers, and supervisors." (R. 71). Based on the ALJ's hypothetical, the VE testified that jobs exist in significant numbers in the national economy for light, unskilled work, and sedentary, unskilled work, which Watson could perform. <u>Id.</u> Specifically, the VE identified the positions of a cleaner or housekeeper (light, unskilled work at 375,000 nationally), clerical checker (light, unskilled work at 130,000 nationally), surveillance system monitor (sedentary, unskilled work at 125,000 nationally), and sorter (sedentary, unskilled work at 110,000 nationally). <u>Id.</u> Accordingly, the ALJ properly relied on the above hypothetical and the VE's testimony in concluding that light or sedentary, unskilled work within her limitations was available to Watson. (R. 17, 22). The undersigned therefore finds no error of law in the ALJ's framing of the hypothetical or his reliance on the VE's testimony.

19

## V.  RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the court GRANT the Commissioner's Motion for Summary Judgment (ECF No. 10), DENY Watson's Motion for Summary Judgment (ECF No. 8), and AFFIRM the final decision of the Commissioner.

## VI.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.    A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/

Douglas E. Miller
United States Magistrate Ju

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
May 18, 2016